F. E. DASHNER et al., Appellants, v. WOODS BROTHERS CONSTRUCTION COMPANY et al., Appellees.

JANUARY 17, 1928.

*Tinley, Mitchell, Ross & Mitchell* and *Cook & Cook,* for appellants.

*Woods, Woods & Aiken, John J. Hess,* and *Genung & Genung,* for appellees.

DE GRAFF, J.—The vagaries and meanders of the Missouri River contiguous to Iowa on its western boundary are a matter of common knowledge. The legislature of this state took notice of this fact, and in the enactment of the drainage law provided that, with reference to improvements along or adjacent to the Missouri River, the word "levee" shall be construed "to include, in addition to its ordinary and accepted meaning, embankments, revetments, retards, or any other approved system of construction which may be deemed necessary to adequately protect the banks of any river or stream, within or adjacent to any county, from wash, cutting, or erosion." Section 7423, Code of 1924.

Pursuant to the provisions of the drainage law of Iowa, a petition signed by certain landowners and taxpayers, including, *inter alia,* the plaintiffs herein, was duly filed before the board

of supervisors of Mills County, asking that the board, acting as a drainage commission, take the necessary steps to establish a river protection district in said county and to construct the necessary protection work and assess the costs thereof to the landowners in a district proposed to be formed in accordance with the benefits conferred on such lands, and to construct in the river wing dams, retards, revetments, or other form of shore protection. It was recognized by the petitioners at this time that it was impossible to describe in the petition ''any particular tract of land or place where the work should be located.'' The Missouri River had been and was cutting away large tracts of land along the shore line, and endangering valuable agricultural lands in the entire proposed district from the Chicago, Burlington & Quincy bridge at Plattsmouth to the south line of Mills County.

In the month of August, 1922, the board appointed Seth Dean as commissioner, to report upon the feasibility and the character of such an undertaking. On the 5th day of September, 1922, his report was filed with the board, accompanied with a preliminary survey, in which report the engineer stated that he had tentatively located such retards and wing dams as he found necessary at that time to prevent bank cutting along the river, and that the river front within the proposed district was then more than 7½ miles long, and that the river was cutting in three places along the bank in the district,—a distance of 8,000 feet in one place, in another place, 6,000 feet, and 1,500 feet in another, with the probability that the shore line necessary to be protected would be increased if the river cut farther to the eastward.

The report of the engineer recommended, as the most feasible, a system of ten retards, more or less, along the cutting bank of the river. These retards consist of a number of grown trees of various sizes, fastened together and anchored along the cutting bank, and cabled to the bank by wire cables, and fastened in the river to concrete piles sunk at intervals in the channel away from the bank.

On the 14th day of November, 1922, a full hearing of the matter was had before the board, objections to the project were received, and, after full consideration, the board passed a resolution of establishment, which provided that a system of bank ·

protection against erosion should be constructed along the east bank of the Missouri River from the Chicago, Burlington & Quincy bridge, running southerly about nine miles to the Mills County line, and that a system of permanent protection work be constructed at such points, in the kind and amount as a permanent survey might show to be necessary, as recommended by the commissioner in his report, and that the entire river front of approximately nine miles, as above stated, should constitute, "for construction purposes, one section."

The resolution further provided that Seth Dean should be appointed construction engineer, with directions to him to prepare plans and specifications, form for contract, and notice to bidders. The engineer proceeded to perform his work, as directed.

Later, competitive bids were received, and the Woods Brothers Construction Company (defendant) was awarded the contract, and the plan and specifications were expressly made a part of the contract. Among other things, the construction company agreed to furnish, at its own expense, all the necessary equipment, machinery, tools, labor, and material (except standing timber) required, and to construct ten retards (more or less) of approximately a total length of 1,050 lineal feet, and such other auxiliary work as might be required according to maps, plans, and specifications therefor. The contract further provided that the work was to be paid for in drainage warrants at par, to be issued by the auditor of Mills County on Missouri River District No. 1, in sums not exceeding 80 per cent of the engineer's monthly estimates of the work done, except the final estimate, when settlement "shall be made in full."

It is further recited in said contract:

"The first party under the contract guarantees that the proper legal steps will be taken to secure funds sufficient to pay for the work as the amounts are certified by the engineer in charge," and "that the work will be done at the expense of said district under the provisions of the drainage laws and that the same has been regularly ordered by resolution of the board of supervisors after an examination by them and recommendation of the drainage district engineer."

It is further provided in said contract:

"The places where retards or other protection work are to

be put in and the amount will be determined by the engineer in charge, and the points marked in advance of construction,'' and that ''the location of the several retards being approximately shown on the official map of the district and tentatively described as follows: * * *.''

The instant contract was duly executed and the required bond was filed by the contractor. The work was commenced in April, 1923, and completed in the month of August following.

In passing, it may be noted that, during the preliminary negotiations, and at the time the contractor began its work, the river was cutting in numerous places, and for this reason the retards were not built in all cases where the preliminary survey tentatively located them, but they were in all cases built at the points where the engineer directed, and the locations were in each case staked by the engineer in advance of construction, and put in under his charge, as provided by the contract and specifications. In other words, the contractor placed the retards at such places only as he was authorized by the contract to place them, and as directed by the construction engineer, who had the delegated authority to fix and designate the locations and direct the size and dimensions of the several parts of the improvement. With this brief summary of the facts, we turn our attention to the propositions urged by the appellants for a reversal.

I. The first charge is that the board of supervisors, acting as a drainage commission, had no power or authority to establish a district and to fix the estimate and improvement thereon in a manner different from the preliminary report of the engineer and recommended by the board. It is a sufficient answer to state that the record does not disclose that, in the establishment of the district, the improvements were ordered done in a manner different from the reported plan. The formal action of the board is as follows:

''Be it resolved that a system of permanent construction work be constructed at such points and in kind and amount as a permanent survey may show to be necessary, substantially as recommended in the commissioner's report.''

It is necessary to keep in mind, in the reasonable construction of the contract in question, that the definite location of the retards was necessarily left to the future judgment and determination of the engineer, by reason of the constantly changing

conditions of the river bank. The point at which the work should be done could not be definitely determined, prior to the time of the actual construction, and this fact was recognized by the specifications attached to the contract. The engineer was the person agreed upon to select the locations and direct the amount of work to be done at each place. The contractor had no discretion in the matter. The board had no engineering skill to bring to bear upon the project. It was left to the engineer to locate the work contemplated as it was being constructed, so that the best possible results could be obtained. There is no impeachment of the engineer. He was on the job, with eye single to secure the best results. The contract must be read and construed in the light of the topography and geography at the time and place in question.

II. It is also urged that the board, as a drainage commission, had no power or authority to authorize the engineer to construct or cause to be constructed the improvements in a manner different from the plan recommended by the engineer. The answer made to the first proposition herein applies with equal force to this point. As herein observed, some person, under the circumstances, must be the judge of the location of the work, in the construction of a project of this character. It was next to impossible to fix definite initial points, and the petition itself, as filed, recognized the impossibility of fixing such points in advance. It is obvious that the contract provided that the places where the retards or other work were to be placed, and the amount thereof, should be determined by the engineer in charge. The plaintiffs were chargeable with notice of the contents of the report of the engineer, and also of the provisions of the contract. A careful study of the record discloses that in no other manner could this improvement have been performed than in the manner of its performance; and in so doing, the intent was carried out, and effectively so. Definite locations could not be selected prior to the actual construction, by reason of the physical facts confronting both contractor and engineer. The contractor was without power or authority to do the work except at the points designated by the engineer, and there is no impeachment of the contractor in the manner of its performance.

III. The next point of challenge is quite similar to the ones previously urged, to wit: That the board had no power or

authority, after establishment, to make or authorize to be made any substantial change in the plans. There was no substantial change in the plans. The engineer followed the express provisions of the specifications and contract, in giving to the contractor the points at which the work was to be performed. Clearly, it was within the power of the engineer, and it was his duty, to locate the retards at such points in the working section as would afford the maximum amount of protection to the land in the district. He acted in good faith, and there is no suggestion to the contrary. He in no wise modified the adopted plan or departed therefrom.

IV. It is next urged that the board was without power or authority to bind the landowners by accepting the work until there was a substantial compliance with the contract, plans, and specifications. This is a repetition of the former challenge, and it is a sufficient answer to say that there was a substantial compliance. The work was inspected many times during its progress, not only by the board, but by many of the landowners and taxpayers. All interested persons knew what was being done, and, upon completion of the job, the engineer filed his report, and accepted the improvement as a completed job. The record shows that the work was done in quantity and quality as contemplated by the contract and specifications. The construction company performed its work in the only manner that it could have been performed. The board and the engineer approved and accepted the work in good faith. There are no facts that would justify a court of equity in denying to the contractor the amount due him under his contract. There is no evidence of actual or constructive fraud. The cases relied upon by appellants are distinguishable from the case at bar. See *Simpson v. Board of Supervisors*, 180 Iowa 1330; *Monaghan v. Vanatta*, 144 Iowa 119.

It is shown that, on September 24, 1923, the board, in regular session, with all members present, took under consideration the report of the engineer, and adopted an order of final acceptance, and further, directed the auditor to make settlement with Woods Brothers Construction Company ''by issuing to them warrants on the Missouri River District No. 1 for the full amount due them on their contract.'' The county auditor did

make settlement with the contractor by issuing and delivering a warrant of said district for the full balance due, as shown by the engineer's report. The board, in ordering payment, determined that the work had been completed. This was a matter peculiarly within its authority, and, in the absence of fraud or improper practices, its action cannot be reviewed in a proceeding of this character. *Patterson v. Baumer,* 43 Iowa 477.

It was the duty of the board to inspect the work before making final payment. This it did, and it accepted the work as fulfilling the contract, and paid for it. Under this record, the appellants are not in a position to insist that the contract was not completed. *Nishnabotna Dr. Dist. No. 10 v. Lana Const. Co.,* 185 Iowa 368.

It is the general rule that the acceptance of an improvement by the duly constituted authority is conclusive on abutting property owners, in the absence of a showing of fraud. *Lux & Talbott Stone Co. v. Donaldson,* 162 Ind. 481 (68 N. E. 1014); *Eversole v. Walsh* (Ky. App.), 76 S. W. 358; *Dawson v. Hipskind,* 173 Ind. 216 (89 N. E. 863).

In conclusion, it may be pointed out that the board said, in the first instance, that the improvement was a public necessity. The improvement has been made, and whatever advantage it is

 to the property owners within the district has been received by them. Justice and equity require that the contractor be paid. This cause comes clearly within the general rule that, when parties stand by and see such improvements made, and take no steps of legal interference, they are estopped to raise the question of validity when called upon to pay for them. *Noyes v. Harrison County,* 57 Iowa 312; *Wood v. Hall,* 138 Iowa 308; *Erickson v. Cass County,* 11 N. D. 494 (92 N. W. 841); *Smith v. Carlow,* 114 Mich. 67 (72 N. W. 22); *City of Seattle v. Hill,* 23 Wash. 92 (62 Pac. 446).

The board of supervisors had jurisdiction and authority to act in the premises. Section 7421, Code of 1924. It is shown that the plan and specifications were substantially consummated. It may be pointed out that the retard or revetment amendment to the statute contemplates work that is materially different from the construction of drainage ditches, and, of necessity, the plans and specifications must be different from those adopted

for the ordinary drainage district project. In the carrying out of this work, no fraud or deceit was practiced or concealment shown. Everything was open and aboveboard. The work was done in a satisfactory manner. Final payment on the contract has been ordered. The trial court properly held that the plaintiffs' claim was without equity, and the decree dismissing the petition is—*Affirmed.*

EVANS, ALBERT, MORLING, and WAGNER, JJ., concur.